J-S50012-20

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

COMMONWEALTH OF PENNSYLVANIA : IN THE SUPERIOR COURT OF
: PENNSYLVANIA
:
v. :
:
:
:
TERREL PICKARD :
:
Appellant : No. 1203 EDA 2019

Appeal from the Judgment of Sentence Entered April 1, 2019
In the Court of Common Pleas of Philadelphia County Criminal Division at
No(s): CP-51-CR-0004266-2017

BEFORE:   BENDER, P.J.E., SHOGAN, J., and STRASSBURGER, J.[*]

MEMORANDUM BY BENDER, P.J.E.:            **FILED:  MARCH 1, 2021**

Appellant, Terrel Pickard, appeals from the April 1, 2019 judgment of sentence of an aggregate term of 20 to 40 years' imprisonment, imposed after he was convicted of one count each of involuntary deviate sexual intercourse,[1] aggravated indecent assault,[2] indecent assault,[3] unlawful contact with a minor,[4] and corruption of minors.[5]  Appellant challenges the sufficiency of the evidence to sustain his convictions and alleges the verdict is against the weight

---

[*] Retired Senior Judge assigned to the Superior Court.

[1] 18 Pa.C.S. § 3123(b).

[2] 18 Pa.C.S. § 3125(a)(7).

[3] 18 Pa.C.S. § 3126(a)(7).

[4] 18 Pa.C.S. § 6318(a)(1).

[5] 18 Pa.C.S. § 6301(1)(ii).

of the evidence. He also challenges the admission of evidence regarding a prior conviction at trial. We affirm.

The trial court summarized the relevant facts of this matter in its Pa.R.A.P. 1925(a) opinion, as follows:

This case involves Appellant's repeated sexual abuse of a minor female, S.V., who at all times was less than thirteen (13) years[] old. S.V. resided with her mother, Tabatha …, in a three-story home in Philadelphia, Pennsylvania. S.V.'s younger sisters, G.P. and C.I., resided with them, as did various relatives on different occasions. Appellant is Tabatha's ex-boyfriend and G.P.'s father.

Tabatha testified at trial that she first met Appellant in 2007 when they worked together at ShopRite. Their relationship became romantic in 2009. Although Appellant did not live in Tabatha's home, "he spent the night a few times" and would occasionally babysit S.V. during the day while Tabatha worked. However, Appellant "went away" for a few years between 2012 and 2015, during which his relationship with Tabatha ceased. They did not resume their relationship until October 2016, following which Appellant stayed at Tabatha's home "probably a couple of times" between October [of] 2016[,] and May 5, 2017.

S.V. testified at trial that she first met Appellant when she was no more than 5 years[] old. She initially had good relations with him, but their relationship soured after Appellant started "touching" her. The earliest incident of abuse occurred around 2009, when S.V. was still around 5 years of age—*i.e.*, before Tabatha's relationship with Appellant had ceased for a few years. While inside the living room of S.V.'s home, Appellant had unbuttoned and pulled down S.V.'s pants, and inserted his penis in her "butt"….[1]

[1] S.V. testified on cross-examination that she does not remember whether Appellant's penis went inside her anus, but she testified at the preliminary hearing that Appellant's penis did go inside her anus.

S.V. also described multiple incidents of abuse that occurred in 2017, after Tabatha and Appellant rekindled their relationship in October 2016. One incident occurred shortly before Easter in

2017, when Appellant took S.V. and her two sisters shopping with Tabatha's vehicle. After shopping at "Family Dollar," the four of them returned to the vehicle. While S.V. placed her youngest sister, C.L., in the backseat, Appellant stood behind her "feeling" her backside. Another incident occurred in the bedroom that S.V. shared with her other sister, G.P…. S.V. was sleeping alongside G.P. on the bottom bunk of their bunkbed when Appellant entered the room, "sat on the bed and … started touching" S.V.'s backside. Appellant then placed his hands inside S.V.'s pants and inserted his finger inside her vagina.[2]

> [2] Regarding the bedroom incident, S.V. testified at trial that Appellant inserted his finger inside her vagina, but she testified at the preliminary hearing that Appellant woke her by inserting his finger inside her anus. She furthermore testified at trial that she never actually saw Appellant's face because he was laying [sic] behind her.

Another incident occurred in the dining room of S.V.'s home, when Appellant picked up S.V., placed her on the floor, and began "humping" her "back and forth" while they both were fully clothed. Another incident occurred inside the enclosed front porch of the home. Appellant entered S.V.'s bedroom during the night and instructed her to go downstairs to the front porch. Once inside the porch, Appellant sat next to S.V. on the couch, stuck his hand beneath her shirt, felt her bare breasts, and began "sucking" and "biting" her nipples. On yet another occasion on the front porch, Appellant pulled down his pants and instructed S.V. to touch his penis, and to move her hand back and forth on his penis.

S.V. testified that she was "scared" to inform her mother about the abuse because she feared Tabatha would not believe her. But on May 5, 2017, S.V. told her sister, G.P., about some or all the above-referenced incidents[,] and G.P. relayed the information to Tabatha. Tabatha immediately asked S.V. about the abuse, and S.V. finally told her mother about what she endured.

Tabatha testified that on May 5, 2017, G.P. came to her bedroom "looking kind of scared," and stated that S.V. needed to tell Tabatha about Appellant['s] "messing" with her. Tabatha thereafter told S.V. to come to her bedroom. Upon entering the room, S.V. "just started crying" and informed Tabatha about "the things that [Appellant] had been doing to her." S.V. advised that

Appellant had "kissed her on the mouth," "touched her breasts," and "put his finger inside her."

After speaking with S.V., Tabatha called S.V.'s biological father who immediately came to the house. Meanwhile, Appellant already was coming to the house[,] but he did not yet know about S.V.'s accusations. When Appellant arrived, Tabatha confronted him in her bedroom and Appellant responded that S.V. was "lying." Tabatha therefore called S.V. to her room, and in Appellant's presence[,] S.V. "said the same thing word for word what he's been doing to her." By this time, additional relatives and friends had arrived at the house and someone had called the police. After police officers arrived, Tabatha accompanied S.V. to the [Philadelphia Children's Alliance ("PCA")] and then to the hospital.

Philadelphia Police Officer Gregory Stewart ("Officer Stewart") testified that he was on patrol around 8:10 p.m. on May 5, 2017, when he received a "radio call for a rape assignment" at Tabatha's address. Upon responding to the scene, Officer Stewart spoke to S.V., who was "nervous" and "very timid." S.V. told Officer Stewart that Appellant had kissed her on the mouth and neck, rubbed her vagina area and breasts, and inserted his finger inside her anus.

The Commonwealth also presented the testimony of Denise Wilson ("Ms. Wilson"), who is employed at [the PCA] as the manager of forensic services. Ms. Wilson explained that the PCA is a child advocacy center that works with the Special Victim's Unit of the police department and the Department of Human Services ("DHS"). When the police or the DHS receive a report of suspected child abuse, the agency contacts the PCA, which provides services to the child and his/her family. The PCA conducts a videotaped "forensic interview" with the child to gather relevant information so the police and DHS personnel can "continue forward with their investigation." During the interview, police and DHS investigators sit in a separate room watching via videotape.

The PCA's forensic interviewer, Christian Dozier,[3] interviewed S.V. in the early morning of May 6, 2017.[4] Following the interview, Ms. Dozier prepared a summary report stating that S.V. had advised that Appellant "kissed her, touched her vagina on her jeans with his forehand, put his finger in her butthole and rubbed on her breasts back and forth with his open palm on

- 4 -

several occasions over the last four weeks." S.V. advised that these incidents occurred inside S.V.'s bedroom and inside her aunt's bedroom. S.V. also stated that Appellant had inserted his "thing" in her anus and "it hurt," that he "sucked on" her breasts, that he "told her to kiss him," that he exposed his penis and "asked her to touch it," that he kissed her neck, that he "humped" her leg, and that he "touched her butt" over her clothing.[5]

[3] Ms. Dozier no longer works at PCA and did not testify at trial.

[4] The Commonwealth played the videotaped interview at trial.

[5] Ms. Wilson testified that the PCA interviewer does not attempt to elicit information from the victim about every incident of abuse. The interviewer rather asks for information about only "a couple of incidents," including the first and/or last incident, and endeavors "to get the general idea of what happened." Similarly, the interviewer does not request the child to identify every location of every incident.

The Commonwealth lastly presented the testimony of Kristine Fortin, M.D. ("Dr. Fortin"), who is an expert "in the field of child sexual abuse pediatrics" and works in the care clinic at Children's Hospital of Philadelphia ("CHOP"). Dr. Fortin testified that S.V. initially was examined in CHOP's emergency room on May 6, 2017,[6] and that she was seen at the care clinic for follow-up care on May 25, 2017. Although the emergency room examination did not reveal any signs of sexual abuse injuries, Dr. Fortin explained that "normal exams" are in fact the norm for the majority of victims and that "a normal physical exam doesn't rule out the possibility of penetration."

[6] The parties stipulated that S.V. was swabbed for DNA during the examination on May 6, 2017, but that no male DNA was detected on any of the swabs taken from S.V.'s vagina and rectum.

Appellant testified in his own defense and denied ever touching or abusing S.V. The bulk of Appellant's testimony was apparently geared toward establishing that S.V. lied about the abuse to avoid punishment for taking Tabatha's Electronic Benefits Transfer ("EBT") card. Appellant further attempted to establish that Tabatha was motivated to endorse S.V.'s lies because she

was already angry at Appellant for ceasing to babysit her youngest child, C.L.

Appellant testified that he and Tabatha "rekindled" their relationship in late February or early March 2017.[7]  Around this time, Appellant worked as a van driver for a transportation company called "City Link," and he frequently babysat C.L. while driving his employer's van.  However, on May 4, 2017, Appellant's employer discovered that he was babysitting C.L. in the company van and told him that was impermissible.  When Appellant informed Tabatha that he could no longer babysit C.L., she "went ballistic."  Appellant agreed to babysit one last time on the next day, Friday, May 5, 2017, but told Tabatha that she thenceforth would have to find new arrangements.

[7] Appellant testified that he never stayed overnight at Tabatha's house because he lived with his other girlfriend and did not want her to discover his affair with Tabatha.

Appellant testified that around 10:30 a.m. the next morning, after he had already picked up C.L., Tabatha called him "screaming" about how S.V. had taken her EBT card and how Tabatha therefore could not buy groceries.  Around 1:30 p.m., Appellant dropped off C.L. at Tabatha's house and subsequently returned to Tabatha's house around 6:00 p.m.  Upon his return, Appellant was confronted with S.V.'s accusations, which S.V. leveled after it was discovered that she had taken Tabatha's EBT card.

At the conclusion of the above evidence and testimony, the jury found Appellant guilty of involuntary deviate sexual intercourse, aggravated indecent assault, indecent assault, unlawful contract with a minor, and corruption of minors.

Trial Court Opinion ("TCO"), 11/22/19, at 2-8 (unnecessary capitalization and citations to record omitted).

On April 1, 2019, the trial court sentenced Appellant to consecutive terms of 10 to 20 years' incarceration for his convictions of involuntary deviate sexual intercourse and unlawful contact with a minor.  The court imposed no sentence for his convictions of aggravated indecent assault, indecent assault,

and corruption of minors. Thus, Appellant received an aggregate sentence of 20 to 40 years' incarceration. On April 3, 2019, Appellant filed a post-sentence motion, which was denied by the trial court on April 10, 2019. Appellant filed a timely notice of appeal on April 17, 2019, followed by a timely, court-ordered Pa.R.A.P. 1925(b) concise statement of matters complained of on appeal.

Appellant presents the following questions for our review:

1. Was the evidence presented at trial insufficient to convict Appellant…?

2. Was [the] verdict so contrary to [the] weight of the evidence that it shocks the conscience of one's sense of justice?

3. Did the trial court err by ruling at a sidebar conference that the prosecuting attorney could cross[-]examine Appellant … that he was previously convicted of aggravated assault and was in prison for three years?

Appellant's Brief at 3.[6]

Preliminarily, we note that Appellant's Rule 1925(b) statement only generally challenged the sufficiency of the evidence to prove "every element of the crimes charged[.]" TCO at 8. Appellant was convicted of five crimes and failed to state with any specificity which elements of which crimes the Commonwealth failed to prove. Rule 1925(b)(4)(ii) provides that a Rule 1925(b) statement "***shall*** concisely identify each error that the appellant intends to assert with sufficient detail to identify the issue to be raised for the judge." Pa.R.A.P. 1925(b)(4)(ii) (emphasis added). Generally, if an appellant "wants to preserve a claim that the evidence was insufficient, then the [Rule]

---

[6] We renumbered Appellant's issues for ease of disposition.

1925(b) statement ***needs to*** specify the element or elements upon which the evidence was insufficient." ***Commonwealth v. Williams***, 959 A.2d 1252, 1257 (Pa. Super. 2008) (quoting ***Commonwealth v. Flores***, 921 A.2d 517, 522 (Pa. Super. 2007) (superseded by statute and overruled in part on other grounds) (emphasis added)). A failure to do so may result in waiver. ***Id.*** We have emphasized the importance of providing such specificity particularly in cases where, as here, the appellant was convicted of multiple crimes, each of which contains numerous elements that the Commonwealth must prove beyond a reasonable doubt. ***See Commonwealth v. Gibbs***, 981 A.2d 274, 281 (Pa. Super. 2009). We further note that, while the trial court did address the topic of sufficiency in its opinion, this is "of no moment to our analysis because we apply [Rule] 1925(b) in a predictable, uniform fashion, not in a selective manner dependent on an appellee's argument or a trial court's choice to address an unpreserved claim." ***Id.*** (citations omitted).

Additionally, Appellant's argument is underdeveloped. "[I]t is an appellant's duty to present arguments that are sufficiently developed for our review." ***Commonwealth v. Hardy***, 918 A.2d 766, 771 (Pa. Super. 2007). Although Appellant appears to challenge the sufficiency of the evidence as to all of his convictions, the argument section of his brief does not refer specifically to any of his offenses, nor does it address or analyze any of the elements of those crimes. "The Rules of Appellate Procedure state unequivocally that each question an appellant raises is to be supported by discussion and analysis of pertinent authority." ***Estate of Haiko v.***

- 8 -

*McGinely*, 799 A.2d 155, 161 (Pa. Super. 2002) (citing, *inter alia*, Pa.R.A.P. 2119(b)). "Without a reasoned discussion of the law … our ability to provide appellate review is hampered. It is not this Court's function or duty to become an advocate for [Appellants]." *Id.* (internal citations and quotation marks omitted).

We observe that Appellant's argument consists merely of bald assertions that "[t]here was no physical evidence" that he sexually assaulted S.V., and that there "was no evidence, other than the unsubstantiated claims of S.V.[,]" and "no corroborating evidence" of her claims regarding Appellant's actions. Appellant's Brief at 14-15. *See also id.* at 20-22. He fails to include any legal analysis and/or citations to legal authority in support of his argument. In fact, aside from setting out the standard of review for sufficiency of the evidence claims, Appellant's argument is otherwise devoid of citation to any legal authority, in violation of Pa.R.A.P. 2119(a). Instead, Appellant solely endeavors to dispute the trial court's findings of fact, pointing to contradictory and self-serving testimony. *Id.* at 20-22. He is essentially asking this Court to re-weigh the evidence and substitute our judgment for that of the fact-finder, which we cannot and will not do. *See Commonwealth v. Rodriguez*, 141 A.3d 523, 525 (Pa. Super. 2016). Accordingly, we deem this issue to be waived.

Even if Appellant had not waived his sufficiency claims, we would deem them meritless. Our standard of review of sufficiency claims is well-settled:

> In reviewing a sufficiency of the evidence claim, we must determine whether the evidenced admitted at trial, as well as all reasonable inferences drawn therefrom, when viewed in the light most favorable to the verdict winner, are sufficient to support all elements of the offense. Additionally, we may not reweigh the evidence or substitute our own judgment for that of the fact finder. The evidence may be entirely circumstantial as long as it links the accused to the crime beyond a reasonable doubt.

*Commonwealth v. Koch*, 39 A.3d 996, 1001 (Pa. Super. 2011) (citations omitted).

The trial court thoroughly summarized the evidence supporting Appellant's conviction for each offense in its Rule 1925(a) opinion, and it concluded that the evidence was sufficient with respect to each offense. *See* TCO at 9-13 (defining the elements of each offense and detailing the evidence supporting each of Appellant's convictions).[7] Based on our review, we would deem the trial court's findings to be properly supported by the record.

Next, we address Appellant's challenge to the weight of the evidence to support his convictions. Appellant essentially argues that S.V.'s testimony at trial "was so inconsistent as compared to her prior testimony about the allegations of improper contact that the verdict should shock the[] conscience of one's sense of justice." Appellant's Brief at 16. Appellant properly preserved his weight of the evidence claim in a timely, post-sentence motion for a new trial, which the trial court denied. *See Commonwealth v. Stiles*, 143 A.3d 968, 980 (Pa. Super. 2016) (noting that a defendant "must present

_____

[7] We would herein adopt the trial court's sufficiency analysis as our own.

his challenge to the weight of the evidence to the trial court for a review in the first instance").

It is well-settled that:

"A motion for a new trial based on a claim that the verdict is against the weight of the evidence is addressed to the discretion of the trial court." ***Commonwealth v. Clay***, … 64 A.3d 1049, 1054-55 ([Pa.] 2013). "A new trial should not be granted because of a mere conflict in the testimony or because the judge on the same facts would have arrived at a different conclusion." ***Id.*** at 1055. When a trial court considers a motion for a new trial based upon a weight of the evidence claim, the trial court may award relief only "when the jury's verdict is so contrary to the evidence as to shock one's sense of justice and the award of a new trial is imperative so that right may be given another opportunity to prevail." ***Id.*** The inquiry is not the same for an appellate court. Rather, when an appellate court reviews a weight claim, the court is reviewing the exercise of discretion by the trial court, not the underlying question of whether the verdict was against the weight of the evidence. ***Id.*** at 1054. The appellate court reviews a weight claim using an abuse of discretion standard. ***Id.*** at 1057.

At trial, the jury [is] the ultimate fact-finder and the sole arbiter of the credibility of each of the witnesses. "Issues of witness credibility include questions of inconsistent testimony and improper motive." ***Commonwealth v. Sanchez***, … 36 A.3d 24, 27 ([Pa.] 2011) (citation omitted). A jury is entitled to resolve any inconsistencies in the Commonwealth's evidence in the manner that it sees fit. ***See Commonwealth v. Rivera***, … 983 A.2d 1211, 1220 ([Pa.] 2009) (stating that "the trier of fact, in passing upon the credibility of witnesses, is free to believe all, part, or none of the evidence") (citation omitted).

***Commonwealth v. Jacoby***, 170 A.3d 1065, 1080 (Pa. 2017).

Instantly, in response to Appellant's weight claim, the trial court opined:

Although S.V.'s trial testimony concerning Appellant's conduct had differed in certain respects from her prior out-of-court statements to the PCA interviewer and her preliminary hearing testimony, and contained certain inconsistencies regarding the exact locations of some of the incidents, her testimony clearly was not so

- 11 -

inconsistent as to render the jury's verdicts contrary to the evidence. Throughout her testimony and out-of-court statements, S.V. consistently detailed one occasion in which Appellant "put his dick in [her] butt" and several occasions in which Appellant either touched her butt, inserted his finger inside her vagina and/or anus, touched her breasts, "sucked on" her breasts, or "humped" her leg.

Given her "tender years" at the time of the incidents, S.V. cannot be expected to have recognized the specific legal significance that attached to each aspect of Appellant's conduct, and to therefore … have secured in her memory the precise details of each of the numerous incidents. [**Commonwealth v.**] **Poindexter**, 646 A.2d 1211, 1215 [(Pa. Super. 1994)] ("Common sense and human experience tells us that a child" less than 13 years of age "cannot and should not be expected to know and/or appreciate the nature and implications of adult sexual relations."). Despite the arguable inconsistences [*sic*] in S.V.'s testimony, it remains that the jury's verdicts are supported by the evidence, and that Appellant identifies no "facts that are so clearly of greater weight that to ignore them or to give them equal weight with all the facts is to deny justice." [**Commonwealth v.**] **Widmer**, [744 A.2d 745, 752 (Pa. 2000)]. Appellant's challenge to the weight of the evidence should therefore be denied.

TCO at 14-15.

As noted, inconsistencies in eyewitness testimony are not sufficient to warrant a new trial on grounds that the verdict was against the weight of the evidence. **See Jacoby**, 170 A.3d at 1080. Although Appellant has highlighted some inconsistencies in the Commonwealth's evidence, the jury was permitted to resolve any such discrepancies in the Commonwealth's favor. Assessing all of the evidence according to the governing principles cited above, we simply cannot conclude that the trial court abused its discretion when it found that the jury's verdict did not shock its sense of justice. Consequently, Appellant's weight challenge fails.

In his final claim, Appellant asserts that the trial court improperly ruled at a sidebar conference that Appellant, while testifying, had "opened the door to a prior assault conviction against the complainant's mother[.]" Appellant's Brief at 17. He states that this ruling "allowed the Commonwealth to cross-examine [him] on his prior conviction in front of the jury, who then improperly used that evidence to convict [him] of the crime[s] charged in the case at bar." *Id.*

As summarized by the trial court,

Appellant testified about his prior assault conviction when the Commonwealth cross-examined him about Tabatha's reliance on him to babysit her youngest daughter[,] C.L.[] Appellant testified that Tabatha asked him to babysit not because Tabatha had such a strong trust in him, but because she had no alternative. Appellant further testified that he agreed to babysit C.L. so that Tabatha would not *again* prevent him from seeing his own daughter, G.P.

TCO at 15 (emphasis in original).

The trial court reproduced the following relevant portion of Appellant's testimony:

Q. She relied on you. She asked you to do it and you said, yes, correct?

A. I do know the people that was in her life, and yes, she asked me and I said yes…. Under the apprehension—the reason I said yes was to maintain a relationship with my daughter. And she was going ballistic. She had no other person to help her…. And so for me to maintain a relationship with my daughter—that's one of the reasons why I didn't see my daughter for three years to begin with, because we had such an acrimonious relationship. A lot of fighting, not physical but arguing.

Q. Sir, you would agree with me you didn't see your daughter for three of those years because you were not in Philadelphia? It has nothing to do with [Tabatha] not allowing you to see her, correct?

…

A. That's not correct. That's not correct. That's not correct.

…

Q. So once again, [Appellant], you would agree with me that you[r] not seeing [G.P.] for those three years, between 2012 to 2015, had nothing to do with [Tabatha], correct?

A. No … No. That's not correct.

…

Q. [Appellant], you could not see [G.P.] within those three years because you were not allowed to come back to Philadelphia, is that correct?

A. Well, in that sense, yes, that's correct.

Q. Correct. So it had nothing to do with [Tabatha's] not allowing you to see—

A. It had to do with [Tabatha], however, yes…. Because we separated from each other because of our past history and use [*sic*] arguing and having fights. Again, nothing physical, but I wasn't allowed to see my daughter. And so … for me to see my daughter, I would have to have a relationship with [Tabatha] or, at least, communicate with her. And we wasn't in commune—so I would be in violation of what was agreed upon for me to speak to her, if I had communication or contact with [Tabatha] or my daughter….

Q. We're not talking about "contact." You just told the ladies and gentlemen of the jury that it's because of [Tabatha] that you couldn't "see" your child for those three years, but that's not true, correct[?]

…

A. So no—so yes, because of [Tabatha], I could not "see" my daughter.

Q. So [Appellant], you're telling me it was because of [Tabatha]. It's not because you were in custody for those three years?

A.    Yes.

Q.    You were in prison for those three years, correct?

A.    Yes.

Q.    So [Tabatha] had nothing to do with you[r] not being able to see your child.  You were in prison.

A.    So what I'm saying is because of [Tabatha], I was in prison.

Q.    That's because you were convicted of assaulting her, correct?

A.    Exactly.

Q.    So even though, during direct examination, you told the ladies and gentlemen of the jury that [Tabatha] had hit you in the past, you, actually, were convicted … of hitting her, correct?

A.    Yes, I was.

Q.    And for that you served three years, correct?

A.    Yes.

…

Q.    You weren't able to see [G.P.] for those three years because you were in prison, correct[?]

A.    Correct.  And I also wish to add that I went to the hospital and there's records of that.  I was the one bleeding in that incident.

*Id.* at 15-17 (quoting N.T. Trial, 1/16/19, at 209-17) (emphasis omitted).

Our standard of review is clear:

"Questions concerning the admissibility of evidence lie within the sound discretion of the trial court, and a reviewing court will not reverse the court's decision on such a question absent a clear abuse of discretion." ***Commonwealth v. Bracey***, 831 A.2d 678, 681 (Pa. Super. 2003) (internal quotation marks and modifications omitted).  "[A] discretionary ruling cannot be overturned simply because a reviewing court disagrees with the trial court's conclusions." ***See Commonwealth v. O'Brien***, 836

A.2d 966, 968 (Pa. Super. 2003) (internal quotation marks omitted).

*Commonwealth v. Hernandez*, 862 A.2d 647, 650 (Pa. Super. 2004).

Moreover, it is well-established that:

Evidence implying other crimes may be introduced when the evidence has a proper evidentiary purpose and is not used merely to demonstrate that the defendant is a person of bad character with a propensity to commit crime. *Commonwealth v. Gwynn*, … 723 A.2d 143, 152 ([Pa.] 1998)…. It is black letter law that the Commonwealth may impeach a defendant's credibility with reference to prior crimes where the defense opens the door. *Commonwealth v. Days*, 784 A.2d 817, 821 (Pa. Super. 2001). "The defendant is not insulated from being discredited about the factual accuracy simply because that proof involves other crimes." *Id.*

*Commonwealth v. Hood*, 872 A.2d 175, 185 (Pa. Super. 2005). Based on our review of the trial transcript, we agree with the court that Appellant opened the door to the questioning regarding his incarceration for a prior crime.

The trial court further opined:

"A prosecutor may not malign an accused with irrelevant evidence of prior crimes, but when crimes or arrests are made relevant by the accused's own testimony, cross-examination on these points is entirely proper." *Commonwealth v. Days*, 784 A.2d 817, 821 (Pa. Super. 2001). "If a defendant delves into what would have been objectionable testimony on the Commonwealth's part, then the Commonwealth can probe into this objectionable area." *Commonwealth v. Patosky*, 656 A.2d 499, 544 (Pa. Super. 1995); *Commonwealth v. Bey*, 439 A.2d 1175, 1178 (Pa. Super. 1982) ("Where the defendant himself opens the door, to what otherwise might be objectionable testimony, the Commonwealth may probe further to determine the veracity of the trial statement."); *Commonwealth v. Trignani*, 483 A.2d 862, 869 [(Pa. Super. 1984)] (evidence of defendant's prior conviction was admissible to rebut defendant's unsolicited character testimony on cross-examination).

Here, the pertinent testimony reflects that Appellant first misrepresented that Tabatha prevented him from seeing his daughter for three years, when in fact he could not see her because he was incarcerated. Appellant then misrepresented that Tabatha somehow caused him to be incarcerated, when in fact he was incarcerated for assaulting Tabatha. Appellant is "not insulated from being discredited about the factual accuracy" of his testimony "simply because that proof involves other crimes." ***Hood***, 872 A.2d [at] 185. The Commonwealth elicited the challenged testimony only **in response** to Appellant's plainly misleading testimony, and this [c]ourt properly permitted the Commonwealth to discredit such misleading testimony by delving into the issue of Appellant's prior conviction.

TCO at 17-18 (emphasis in original). We discern no abuse of discretion by the trial court. Accordingly, we uphold Appellant's convictions.

Judgment of sentence affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 3/1/21

- 17 -